UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SuperValu, Inc.,                                                                 Civil No. 04-3569 (DWF/SRN)

           Plaintiff,

v.                                                                                                **MEMORANDUM**
                                                                                          **OPINION AND ORDER**

Quality Farms, Inc.,

           Defendant.

___

Thomas F. Pursell, Esq., Lindquist & Vennum PLLP, counsel for Plaintiff.

Patrick T. Tierney, Esq., Collins Buckley Sauntry & Haugh PLLP, counsel for Defendant.

___

**Introduction**

The above-entitled matter came before the undersigned United States District Court Judge on September 7, 2005, pursuant to Defendant Quality Farms, Inc.'s ("Quality Farms") Motion for Summary Judgment. By its Complaint, Plaintiff SuperValu, Inc. ("SuperValu") asserts a cause of action for breach of contract. Quality Farms asserts a counterclaim for breach of contract. For the reasons set forth below, Quality Farm's Motion for Summary Judgment is denied.

**Background**

This matter arose from a dispute about whether the parties entered into a contract for the sale of chicken breasts. SuperValu is the largest privately-held grocery wholesaler in the United States and one

1

of the largest private meat buyers.  Quality Farms freezes, packages, and resells raw poultry to retailers. Quality Farms has done $3-4 million dollars of business with SuperValu since 2002.

SuperValu contends that telephone conversations and email correspondence between the parties resulted in two initial contracts for the sale of chicken breasts.  SuperValu further contends that the parties merged these two separate contracts into a single, integrated contract on March 25, 2004. In its motion for summary judgment, Quality Farms asserts that the parties did not enter into a valid contract.  Alternatively, Quality Farms asserts that if a valid contract did exist, SuperValu breached that contract.

SuperValu contends that the first contract was an oral agreement made in December 2003 (the "December Contract") in which Quality Farms agreed to ship 20 loads of chicken breasts at $1.43 per pound for delivery through February 2004.  Craig Grimm, Quality Farms' vice-president, acknowledged the December contract in his deposition.  (Affidavit of Thomas F. Pursell in Support of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pursell Aff."), Ex. 2, Deposition of Craig Grimm ("Grimm Dep.") at 51.)  The only document that reflects the alleged December contract is an email from Grimm to Vivian Bluhm, SuperValu's poultry buyer, on February 4, 2004.  That email lists 10 loads that the parties agree were shipped and the corresponding invoice numbers and delivery information.

The second contract, according to SuperValu, resulted from negotiations following an online auction that SuperValu conducted in December 2003.  SuperValu solicited bids for the price of chicken breasts it sought to purchase during February, March, and April 2004.  Quality Farms submitted the lowest bid, but SuperValu declined to purchase chicken breasts from Quality Farms because the bid did

not reach SuperValu=s target prices. The parties agree that Quality Farms' auction bid did not create a contract between the parties. However, according to SuperValu, the following emails created a second contract (the "January Contract"). On January 6, 2004, Bluhm, emailed Grimm, inquiring ADo you see prices any different than when we held the auction on BS breasts a couple weeks ago? Your original bid was $1.58 for Feb[.], $1.61 for March and $1.63 for April[.]@ (Pursell Aff., Ex. 1 at 2.) On January 12, 2004, Grimm emailed Bluhm and stated that Quality Farms would honor its bid quotes. (*Id*. at 3.) On January 19, 2004, Grimm again emailed Bluhm, reiterating, AWE WILL HONOR THE BID QUOTES FOR MARCH.@ (*Id*. at 4.) Bluhm replied, "Book the BS Breasts at the $1.61 (sic) delivered to us in March – all Farm Fresh bags. . . . (sic) 24 loads unless you can do any more[.]" (*Id*. at 5.)

On February 5, 2004, Bluhm emailed Grimm, inquiring whether Quality Farms would "hold off on shipping the remaining loads" under the alleged December contract until after SuperValu's fiscal year ended on February 28, 2004. (*Id*. at 9.) Grimm did not respond. During March 2004, Bluhm sent two emails to Grimm regarding shipment schedules for the alleged December and January contracts. On March 11, 2004, Bluhm asked, "How soon do you need a destination for the 24 loads that are booked for me to ship in March at $1.61?" (*Id*. at 12.) On March 15, 2004, Bluhm emailed Grimm to clarify SuperValu's "bookings" under the alleged December and January contracts and to request that Grimm send the shipping schedule the next day. (*Id*. at 13.)

The price of chicken breasts rose dramatically in late February and early March 2004. On March 17, 2004, Grimm emailed Bluhm, stating:

3

> The Cub loads @ 1.43 since the loads could not finish shipment in February 2004, the price of 1.43 is no longer available, due to market conditions. The price for March of 1.61 the PO's were never cut your response back to me came viva an email on 3/11/04 at 1:53 pm which is 2 weeks into March, we could not get the loads produce for March any ways by that time[.] We can sell you at -.15 of the Urner Barry.[1]

(*Id*. at 14–15 (mistakes in original).) Bluhm replied the same day:

> The agreement you made with me in December was 20 loads of Cub at $1.43. 9 have shipped.[2] In February I asked you if you could hold the remaining loads until shipping February 28th, after our fiscal year end and you agreed. I did not hear one word from you that by you agreeing to do this we would not have the product available, or I would have gone ahead and shipped them.
> The price of $1.61 (not $1.58) for 24 loads to ship in March was booked with you on January 12th. You agreed to ship in March at the auction bid price of $1.61, and confirmed again on January 19th by email that it was our deal. You have never contacted me asking for POs to ship the product, and we were not finished receiving the previous 11 loads that Quality Farms owes us.
> I understand that market conditions are very high, but a deal is a deal. I expect that you will make this situation whole with Supervalu or we will not be using Quality Farms as a store brands supplier. I thought we had a better working relationship than for you to dump on us when your suppliers are not cooperating with you.
> I am not interested in ordering the same product at UB less $.15 that were booked at the levels stated above.

(*Id*. at 14.) Quality Farms contends that it had no obligation to ship chicken breasts pursuant to its quoted prices until SuperValu issued a purchase order and Quality Farms accepted the purchase order. However, Bluhm stated in her affidavit that neither SuperValu nor its suppliers treat the issuance of purchase orders as a requirement for a binding agreement.

---

[1] "Urner Barry" ("UB") is an index of poultry prices.
[2] At this time the parties agree that Quality Farms shipped 10 loads pursuant to the alleged December contract.

According to SuperValu, the parties then created a third contract (the "March Contract") that integrated alleged December and January Contracts. Following a conference call between the parties, Bluhm emailed Grimm on March 25, 2004:

> Per our conversation with you this morning, Supervalu and Quality Farms agree to the following solution to the 10 outstanding loads of Cub IQF BS breasts originally committed to Supervalu at $1.43 lb, and 24 loads of Cub IQF BS breasts originally committed to Supervalu at $1.61 lb (34 loads total).
>
> Quality Farms will ship 5 loads of the 10 Cub BS breasts at $1.43 lb delivered. These loads will all ship to the Supervalu Hopkins DC. Po's to follow – delivery dates will be:
> 4/14
> 4/19
> 4/21
> 4/23
> 4/26
>
> The remainder of the 29 loads will be priced and shipped as follows (using $2.10 UB to set our benchmark):
> 5 loads at UB less $.67 – UB based off the Monday the week of ship
> 24 loads at UB less $.49 – UB based off the Monday the week of ship
>
> We will take 4 loads per month at the above agreed upon formula for 7 months, or until the commitment has been fulfilled.
>
> Supervalu will also take 5 loads of IQF Quality Farms Party Wings packed 8/4 # at $1.28 lb delivered. These will ship to our Mechanicsville VA division.

(*Id*. at 16 (mistakes in original).)

According to SuperValu, the terms in the alleged March contract included some deliveries at the previously booked prices and some at a formula based on Urner Barry. SuperValu asserts that it used the Urner Barry indices to make it easier for Quality Farms to sell SuperValu chicken breasts by tying pricing to the rising market. SuperValu also contends that it agreed to extended delivery times and to purchase chicken wings from Quality Farms at current market prices in the alleged March contract.

5

Bluhm instructed Grimm to acknowledge the March 25 email the same day by sending a "reply with history." The next day Grimm replied "The email I received from you on 3/25/04 10:55:21, about the conversation I had with you and your boss Vic. Is [sic] accurate in regard to the loads and pricing." (*Id*. at 17.) Grimm also stated that there was one exception—that SuperValu purchase any "additional items" that Quality Farms may have to offer. (*Id*.) Because Grimm did not "reply with history," Bluhm asked SuperValu's accounts payable office to put Quality Farms on a payment hold.

On March 31, 2004, Grimm replied to Bluhm, displaying the history of Bluhm's March 25 email, stating "Again I agreed to what we talked about. This letter is accurate on what we spoke about. Again this was covered in the email I sent you on 3/26/04 12:39:20 pm[.] Our intent is to fulfill the orders, but by holding payment up does not help matters at all, and to use that as a strong arm technique, is not right." (*Id*. at 18.) Bluhm requested that the payment hold be lifted. SuperValu resumed cutting checks to Quality Farms on April 2, 2004, and asserts that no payments were delayed. Grimm further acknowledged in his deposition that Bluhm's March 25 email correctly reflected the parties' agreement. (Grimm Dep. at 58.)

Grimm sent Bluhm several emails in April promising that Quality Farms would ship the chicken breasts. For example, on April 15, 2004, Grimm emailed Bluhm, "I don't want you to think I am not shipping any of the deal we worked out. We had some problems with cash flow! We are moving forward now, and the first things shipping will be are [sic] Party Wings. And then the B&S Chicken Breasts." (Pursell Aff., Ex. 1 at 20.) Nonetheless, Quality Farms did not deliver any chicken breasts pursuant to the alleged March Contract.

On May 3, 2004, Bluhm emailed Grimm requesting the exact delivery dates on five "Cub IQF BS Breast PO's." (*Id*. at 22.) Bluhm stated, "We are running behind on our make-up schedule. It mak[e]s me nervous to give orders when I cannot get commitments on when anything will ship." (*Id*.) On May 10, Bluhm emailed Grimm, stating that if Quality Farms did not deliver the chicken breasts, SuperValu might buy replacement chicken breasts from another supplier and bill Quality Farms for the difference in cost from the parties' alleged March contract. (*Id*. at 23.) Grimm responded to Bluhm the next day:

> With further thought in regard to Supervalu finding product elsewhere and then billing us the difference, this does not work for us because we have no clue what the cost may be, and we control none of the costs that are going to incur our losses.
>
> Also the holding back of invoices will kill this whole agreement because if we do not have the money, and or our cash flow has been stopped by you, like the invoice that I emailed you on yesterday. My suppliers will not ship me.
>
> The invoice I emailed you about yesterday was held up, and is posing a problem with one of our suppliers.
>
> Payment out of our terms is completely unacceptable.

(*Id*. at 24 (mistakes in original).) Grimm sent Bluhm several more emails stating that Quality Farms needed SuperValu to pay outstanding invoices. (*See* Patrick T. Tierney Affidavit in Support of Defendant's Motion for Summary Judgment ("Tierney Aff.") at Exs. 29, 30, 31.)

On May 24, 2004, Grimm terminated any future business deals with SuperValu. (Pursell Aff., Ex. 1. at 27.) Grimm alleged that SuperValu's payments were arriving 20 days overdue and that SuperValu had improperly taken a deduction on a load of chicken tenderloins. (*Id*.) SuperValu then attempted to stop payment on three outstanding checks. SuperValu was successful in stopping payment

7

on one check and asserts that the amount of that check should be deducted from the damages it incurred by purchasing replacement chicken breasts.

Quality Farms alleges that if a contract existed between the parties, SuperValu breached by failing to timely and fully pay invoices. Quality Farm asserts that SuperValu was required to make payments according to the terms stated on Quality Farms' invoices. The invoices stated that a service fee of 1.5% per month (18% annual) would accrue on all past due accounts. (*See* Tierney Aff. at Exs. 16, 18, 20, 22, 24.) Additionally, the invoices indicated that payment was to be received by Quality Farms within ten days of the delivery date. SuperValu asserts that Quality Farms was subject to its "Vendor Correspondence Procedures," which identify a process for resolving payment disputes. Additionally, SuperValu asserts that Quality Farms was subject to its payment terms, whereby SuperValu cut checks twelve days after receiving shipments.

Quality Farms alleges that SuperValu failed to fully pay the following invoices:

- Invoice #253 stated a delivery date of March 16, 2004, and an invoice amount of $72,468, due March 26, 2004. (Tierney Aff. at Ex. 16.) SuperValu paid this invoice with a check dated April 2, 2004, but Quality Farms alleges that it did not receive the funds until April 8, 2004. (*Id*. at Ex. 17.)

- Invoice #254 stated a delivery date of March 31, 2004, and an invoice amount of $73,921.50, due April 10, 2004. (*Id*. at Ex. 18.) SuperValu paid this invoice with a check dated April 12, 2004, but Quality Farms alleges that it did not receive the funds until April 19, 2004. (*Id*. at Ex. 19.)

- Invoice #259 stated a delivery date of April 21, 2004, and an invoice amount of $51,200, due May 1, 2004. (*Id*. at Ex. 20.) SuperValu paid $50,088 of this invoice with a check dated May 12, 2004, but Quality Farms alleges that SuperValu took an improper deduction. (*Id*. at Ex. 21.)

- Invoice #260 stated a delivery date of April 27, 2004, and an invoice amount of $51,200, due May 7, 2004. (*Id*. at Ex. 22.) SuperValu paid $50,176 of this invoice

> with a check dated May 14, 2004.  (*Id*. at Ex. 23.)  Quality Farms alleges that it did not receive the funds until May 21, 2004, and that SuperValu took an improper deduction.
>
> - Invoice #261 stated a delivery date of May 5, 2004, and an invoice amount of $51,200, due May 15, 2004.  (*Id*. at Ex. 24.)  SuperValu paid $47,513.60 of this invoice with a check dated May 17, 2004.  (*Id*. at Ex. 25.)  Quality Farms has not received payment on that invoice because SuperValu stopped payment on its check.

Quality Farms alleges that SuperValu concedes it incorrectly took discounts on invoices #259 and #260, pointing to an email from Kathy Luce, an accounting support employee at SuperValu, to Bluhm, dated May 24, 2004.  In that email Luce states that SuperValu took discounts in error on those invoices.  Quality Farms has counterclaimed to recover for damages caused by SuperValu's failure to pay invoice #261 and SuperValu's alleged failure to fully and timely pay other invoices.

## Discussion

### I.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving part must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Breach of Contract

The essential question here is whether SuperValu and Quality Farms formed a valid contract. A binding contract requires an offer, acceptance of the offer, and consideration. *Cederstrand v. Lutheran Bhd.*, 117 N.W.2d 213, 219–21 (Minn. 1962). Furthermore, "[a] contract requires a meeting of the minds concerning its essential elements." *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn. 1980).

This dispute is governed by Article 2 of the Minnesota Uniform Commercial Code (UCC) because it involves the sale of goods between merchants. Minn. Stat. §§ 336.2–104-106 (2004). The statute of frauds under the UCC includes a writing requirement:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Minn. Stat. § 336.2–201(1) (2004). Electronic records or signatures such as emails are sufficient to document contracts and acknowledge signatures. Minn. Stat. § 325L.07 (2004). Several papers may be taken together to form the writing if they plainly relate to the same transaction. *Casazza v. Kiser*, 313 F.3d 414, 419 (8th Cir. 2002).

Quality Farms denies entering into the alleged contracts with SuperValu. Quality Farms asserts that the alleged December and January contracts did not satisfy the writing requirement of the statute of frauds. Additionally, Quality Farms asserts that it stopped shipping under the alleged December Contract at Bluhm's request. Quality Farms asserts that the parties did not form the alleged January Contract because SuperValu never issued purchase orders identifying shipment dates and destinations for the chicken breasts. Quality Farms maintains that it was willing to sell chicken breasts to SuperValu at its auction bid price for March, but was never obligated to sell until it accepted SuperValu's purchase orders.

Finally, Quality Farms contends that the parties did not enter into the alleged March Contract because that alleged contract lacked consideration. Quality Farms alleges that there was no consideration because SuperValu coerced Quality Farms into agreeing to ship chicken breasts at below market prices by withholding $72,468 in payment on March 25, 2004, for accepted shipments.

SuperValu contends that the January and March emails satisfy the UCC's statute of frauds' writing requirement. SuperValu acknowledges that while there is no apparent writing showing the formation of the alleged December Contract, later email status reports show that it existed and that the parties intended to be bound. Furthermore, SuperValu contends that Quality Farms acknowledged the existence of this agreement. SuperValu also contends that its request for delayed deliveries did not

excuse Quality Farms from delivering the 10 remaining loads under the alleged December Contract. According to SuperValu, the parties' course of dealing established that Grimm responded to Bluhm's requests to delay deliveries when it was unfeasible for Quality Farms to delay deliveries. SuperValu points out that in February 2004, when Bluhm requested delayed deliveries of six loads of chicken breasts under a different contract, Grimm informed Bluhm that he could not hold off delivering the six loads until March. Therefore, according to SuperValu, Grimm established that he would respond to Bluhm's requests for delayed deliveries when Quality Farms was unable to accommodate the requests. Alternatively, SuperValu asserts that the alleged March contract integrated Quality Farm's obligation to ship the 10 remaining loads under the alleged December contract into the parties' resolution of their entire dispute.

SuperValu alleges that the mutual promises memorialized in Bluhm's March 25 email provided adequate consideration for the alleged March Contract. Additionally, SuperValu alleges that SuperValu's promise to give Quality Farms the benefit of higher prices, extended delivery, and additional purchases of chicken wings at favorable prices provided the requisite consideration.

The Court finds that the alleged oral December Contract does not satisfy the statute of frauds writing requirement because the only document evidencing this alleged contract is an email from Grimm to Bluhm listing the ten loads that the parties agree were already shipped. However, the December Contract is enforceable because Grimm acknowledged it in his deposition. *See* Minn. Stat. § 336.2–201(3)(b) (2004) (delineating that a contract that does not satisfy the statute of frauds' writing requirement is enforceable "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made . . ."). Moreover, the Court finds that

the alleged December and January Contracts were replaced by the March Contract, which clearly satisfied the writing requirement.

The Court also finds no merit to Quality Farms' assertion that SuperValu's request to move back the delivery dates under the December contract excused Quality Farms from shipping any chicken breasts. The parties' course of dealing demonstrates that Quality Farms informed Bluhm when pushing back delivery dates was unfeasible for Quality Farms. Therefore, the Court finds that the parties entered into a contract for the sale of chicken breasts in December 2003.

Additionally, the Court finds that the parties entered into another contract in January 2004. Read in the light most favorable to SuperValu, the January email correspondence demonstrates that the parties entered into a contract for the sale of 24 loads of chicken breasts at $1.61 to be delivered in March 2004. Bluhm asked Grimm whether the bid prices from the December 2003 auction were still available. Grimm responded by email, "WE WILL HONOR THE BID QUOTES FOR MARCH." This response constituted an offer because it manifested Quality Farms' intent to be bound by its March bid quote. On January 21, Bluhm accepted Quality Farms' offer by responding, "Book the BS Breasts at the $1.61 [sic] delivered to us in March – all Farm Fresh bags. . . . [sic] 24 loads unless you can do any more."

Quality Farms' assertion that it did not enter a contract with SuperValu until Quality Farms decided to accept a purchase order is not persuasive. Under the UCC, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Minn. Stat. § 336.2–206(1)(a) (2004). Here, SuperValu's email acceptance was reasonable under the circumstances and indicated that the parties had a "meeting of the minds." Quality

13

Farms never specified that SuperValu needed to issue a purchase order in order to make a valid contract.

The Court also finds that the January emails satisfy the statute of frauds' writing requirement. Taken together, the emails demonstrate the existence of a contract. Bluhm's January 21 email specified the quantity of shipments as well as the price, and Grimm's email contained a signature.

Finally, the court finds that there was sufficient consideration to support the March Contract. The Court finds no merit in Quality Farms' assertion that it was coerced into accepting the March Contract by Bluhm's withholding of payments. The evidence reveals that Bluhm memorialized the parties' conference call in an email on March 25, 2004. Grimm acknowledged the accuracy of the email, but failed to "reply with history" in his response email. Only then did Bluhm place Quality Farms on a "payment hold," which was lifted days later when Grimm sent another acknowledgement of Bluhm's March 25 email that displayed the history. Thus, the parties' "meeting of the minds" occurred prior to Bluhm's request that SuperValu place Quality Farms on a payment hold.

"Where promises are mutual, made concurrently, and incorporated into a bilateral contract, such promises are sufficient consideration for each other." *Kielley v. Kielley*, 674 N.W.2d 770, 777–78 (Minn. Ct. App. 2004). Here, the parties' mutual promises provided adequate consideration. Furthermore, Quality Farms received the benefit of higher prices, extended delivery dates, and additional sales of chicken wings. Accordingly, the Court finds that the parties entered into a valid contract in March, which replaced the December and January contracts.

Based on this analysis, the Court finds that summary judgment is not appropriate on Quality Farm's assertion that no contract existed. Because the Court has determined that a valid contract existed, the Court next turns to Quality Farm's assertion that SuperValu breached that contract.

The UCC provides:

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery . . . then with respect to any goods directly affected and, if the breach is of the whole contract . . , then also with respect to the whole undelivered balance, the aggrieved seller may
>
> > (a)   withhold delivery of such goods;
> >
> >    . . .
> >
> > (f)    cancel.

Minn. Stat. § 336.2–703 (2004). But where the seller breaches, the buyer may "'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Minn. Stat. § 336.2-712(1). "The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . ." *Id*. at § 712(2).

Quality Farms asserts that SuperValu breached the contract by failing to timely and fully pay invoices beginning in the end of March 2004, thereby excusing Quality Farms from shipping chicken breasts to SuperValu. Quality Farms asserts that SuperValu failed to make payments according to the terms stated on Quality Farm's invoices. Additionally, Quality Farms alleges that SuperValu refused to pay Quality Farms by stopping payment of outstanding checks on March 26, 2004.

Quality Farms alleges that it is entitled to summary judgment on its counterclaim because SuperValu placed Quality Farms on a second "payment hold" on May 25, 2004, successfully stopping payment on a check for $47,513.60. Additionally, Quality Farms alleges that SuperValu took improper deductions on two other invoices.

SuperValu asserts that Quality Farms was subject to its business terms and conditions, including its schedule of making payments and process for resolving payment disputes. SuperValu also contends that Quality Farm's complaints about unauthorized deductions were handled in accordance with the process set by SuperValu's underlying terms and conditions. According to SuperValu, it paid within its terms, "except on a few occasions when a computer system transition in the company's Eastern Region slowed payments by a few days in the spring." Additionally, SuperValu alleges that it was justified in putting Quality Farms on a payment hold on March 26, 2004, after Quality Farms allegedly breached a contract. Furthermore, SuperValu alleges that no payments were missed as a result because the hold was lifted within days following Quality Farms "reply with history" to SuperValu's March 25, 2004 email.

Finally, SuperValu alleges that Quality Farm's complaints about late payments were mere pretext for excusing its performance under the parties' agreement. SuperValu notes that Grimm sent a series of emails in April and May, promising delivery. SuperValu asserts that Quality Farms brought up the issue of late payments only after SuperValu inquired about the possibility of purchasing chicken breasts from another seller and billing the difference to Quality Farms.

SuperValu contends that Quality Farms is not entitled to summary judgment on its counterclaim because SuperValu properly stopped payment on a check pursuant to its May 25, 2004 payment hold

16

after Quality Farms repudiated the contract, forcing SuperValu to purchase higher-priced replacement chicken breasts.  SuperValu asserts it was entitled to offset its cover damages under Minn. Stat. § 336.2-712(1), but notes that the amount withheld should be subtracted from the final calculation of damages owed SuperValu.

The Court finds that a genuine issue of material fact exists regarding whether a breach of contract occurred.  Quality Farms asserts that SuperValu breached by placing Quality Farms on a payment hold on March 26, 2004.  However, SuperValu asserts that it was justified in ordering the payment hold, and that the hold was lifted before any payments were stopped.  Both parties assert that its terms and conditions governed the contract.  Quality Farms asserts that SuperValu's late and partial payments on other contracts constituted a breach of the March contract.  SuperValu asserts that it paid on time, except for a few occasions when it was a few days late.  SuperValu also contends that any disputes about these payments should be handled pursuant to its terms and procedures.  Because there is a genuine issue of material fact on the issue of breach, summary judgment is not appropriate on SuperValu's breach of contract claim nor on Quality Farm's counterclaim.  Therefore, the issues to be tried will be those relating to the breach issue on Supervalu's contract claim and Quality Farm's counterclaim.

For the reasons stated, **IT IS HEREBY ORDERED THAT:**

1. Defendant Quality Farm's Motion for Summary Judgment [Doc. No. 24] is **DENIED**.

Dated:  October 6, 2005             s/Donovan W. Frank
                                    DONOVAN W. FRANK
                                    Judge of United States District Court